| | |
|---|---|
| **19th Judicial District Court**<br>**Weld County, State of Colorado**<br><br>Court Address:   901 9th Ave<br>                              Greeley, CO 80631 | DATE FILED: April 28, 2021 9:35 AM<br>FILING ID: 196EF718EF02D<br>CASE NUMBER: 2021CV30232 |
| **Plaintiffs:**  PDub Ents. LLC, Windsor One, LLC and Big Prairie Ents, LLC, a Wyoming Limited Liability Company<br><br>v.<br><br>**Defendant:**  Scottsdale Insurance Company | ▲   COURT USE ONLY   ▲ |
| **Attorneys for Plaintiffs:**<br>Attorney:     David M. Roth, #44800<br>                    Jennifer A. Milne, #46286<br>Address:      Roth Milne<br>                    950 South Cherry Street, Suite 416<br>                    Denver, CO 80246<br>Phone Num.: (303) 662-8082<br>FAX Num.:    (303) 662-8083<br>E-Mail:         david@randmlaw.com<br>                    jennifer@randmlaw.com | Case Number:<br><br>Div.: |

## COMPLAINT AND JURY DEMAND

COMES NOW PLAINTIFFS, PDub Ents. LLC, Windsor One, LLC, Big Prairie Ents, LLC, a Wyoming Limited Liability Company  by and through their attorneys, Roth Milne, and respectfully submits the following Complaint against the above-named Defendant:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff, PDub Ents. LLC is a Colorado Limited Liability Company with its primary place of business and domicile in Weld County, Colorado.

2.     Plaintiff, Windsor One, LLC is a Colorado Limited Liability Company with its primary place of business and domicile in Weld County, Colorado.

3.     Plaintiff, Big Prairie Ents, LLC, a Wyoming Limited Liability Company is a Foreign Limited Liability Company incorporated under the laws of Wyoming.

4.     Paul Sacco is a member PDub Ents. LLC, and is a citizen and domiciled in Larimer County, Colorado.

5.     Paul Sacco is a member Windsor One, LLC, and is a citizen and domiciled in Larimer County, Colorado.

6.     Paul Sacco is a member Big Prairie Ents, LLC, a Wyoming Limited Liability Company, and is a citizen and domiciled in Larimer County, Colorado

7.     Upon information and belief, Defendant, Scottsdale Insurance Company (hereinafter "Defendant"), is a foreign corporation in the business of marketing, drafting, and selling insurance policies to cover property located in Colorado.

8.     This Court has jurisdiction over the subject matter of this action and the parties hereto.

9.     Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

## GENERAL ALLEGATIONS

10.    Defendant issued Policy Number CPS284611 (hereinafter "Policy") to Plaintiffs insuring the property located at 705 Lincoln Avenue, Nunn, CO 80648 (hereinafter the "Property") during the period in which the subject loss occurred.  The Policy was in force at all relevant times identified in this Complaint.

11.    The insurance policy covers, *inter alia*, all risks of direct physical loss or damage located at the Property, including fire and smoke damage.

12.    On or about June 19, 2018 hailstorm, causing damage to Plaintiffs' Property, specifically the roof of the Property.

13.    The Property was being repaired as a result of the covered damage sustained from the hailstorm.

14.    While the roof of the Property was being repaired, the gutters had been removed in order to be replaced.

15.    On or about September 9, 2019, heavy rain fell on the Property, causing damage to the electrical box.

16.    On or about September 9, 2019, a fire broke out on the Property, causing substantial damage to the Property.

17.    Plaintiffs filed a claim very soon after and were assigned claim number 01916141.

18.    Because of the loss being fire, a fire investigator was needed to inspect the Property to determine the cause of the fire.

19.    Defendant was able to conduct its own investigation simultaneously with the fire investigation.

20.    On or about September 17, 2019, Defendant informed Plaintiffs that its field adjuster was working on the estimate for the Property, and that it should be uploaded for review that week.

21.     On or about September 26, 2019, Defendant sent an email to Plaintiffs informing them that it would be providing an advance payment of $50,000 and that it would let them know once more was approved.

22.     Between September 30, 2019 and October 22, 2019, Plaintiffs followed up with Defendant on numerous occasions on the status of the claim, with no response from Defendant.

23.     On or about October 23, 2019, after receiving no response to the multiple phone calls and emails made to Defendant, Plaintiffs reached out to Defendant to request the estimate explaining what needed to be done in order to repair the Property.  It had now been six (6) weeks since the fire and Plaintiffs nor their tenant had been able to use the Property during this time.

24.     Plaintiffs were not permitted to enter the Property according to Defendant.

25.     On or about November 4, 2019, November 14, 2019, and November 19, 2019, Plaintiffs emailed Defendant again to ask for the estimate so that they could begin repairs.

26.     On or about November 26, 2019, seventy-eight (78) days after the fire, Defendant submitted its first estimate to repair the Property, which identified a replacement cost value ("RCV") $168,422.88 and an actual cost value ("ACV") of $149,792.14.

27.     On or about December 4, 2019, Plaintiffs informed Defendant that the estimate it provided lacked items that would need to be included, namely, replacement of the $CO_2$ system, 2 large HVAC systems, and video surveillance cameras.

28.     Because of the amount of damage to the Property, a repair was not possible and a rebuild would be required.

29.     On or about December 28, 2019, Plaintiffs sent Defendant the estimate to rebuild the Property.

30.     On or about December 31, 2019, Plaintiffs sent Defendant an email requesting a quick response, as the company Plaintiffs wanted to use to rebuild the Property were wanting to start the following week.

31.     On or about January 2, 2020, Plaintiffs sent Defendant a letter from the chosen contractor which stated that the building could not be repaired.  In the same email, Plaintiffs clarified that the estimate they provided would also be slightly more once the HVAC units were included.

32.     On or about January 3, 2020, Defendant finally responded that it was reviewing the documentation, and trying to determine if it would require a structural engineer.

33.     On or about January 3, 2020, Defendant informed Plaintiffs that it would need to get a structural engineer involved and hired Envista Forensics ("Envista").

34.     On or about January 21, 2020, Envista conducted an inspection of the report.

35. In its report dated February 5, 2020, Envista highlights all the damage to the Property. While most of this is quite obvious, as this was a fire. What Envista concludes though, is that the damage structural elements may be repaired by using new structural members and connections, as long as this meets code requirements.

36. The amount of charred damage to the Property though, as stated previously by Plaintiffs' chosen contractor, as Envista themselves highlights 14 – 50 foot span trusses; 60 linear feet of 2.x4 purlins and 2x4 wood braces; 3 12 foot tall 6x6 posts; 16 linear feet of wall faming and 4 linear feet of truss faming members. Envista found charred areas and smoke stains throughout the Property.

37. Per the building code, "any amount of char would be expected to reduce the capacity of the member by an amount that would render the elements not serviceable". Meaning any amount of char would require that component to be replaced, and not be repaired.

38. On or about February 5, 2020, Plaintiffs current Tenant terminated its lease because they were unable to use it for its business for this extended period of time.

39. On or about February 14, 2020 Plaintiffs informed Defendant that because of the amount of time it was taking to complete the claim, their current tenant had terminated their lease.

40. On or about February 24, 2020, Plaintiffs emailed Defendant again to ask for more information on the claim. It is now 6 (six) months from the date of loss.

41. On or about March 12, 2020, All Phase Restoration submitted an estimate with an RCV of $279,388.09. The bid was sent to Defendant on or about March 18, 2020.
.
42. Because of how complex the claim was becoming, Plaintiffs hired a public adjuster, Matt Stalcup, on or about March 20, 2020.

43. On or about March 23, 2020 Mr. Stalcup sent his Letter of Representation to Defendant.

44. Plaintiffs sent an email to Defendant on or about March 27, 2020 informing it that they had chosen Mr. Stalcup to act as their public adjuster.

45. Mr. Stalcup followed up again on March 30, 2020, and April 1, 2020 after hearing nothing from his email and phone calls.

46. Defendant emailed Mr. Stalcup on April 1, 2020 and informed him that it had received the estimate from All Phase Restoration and asked to set up a time to have a phone call with him.

47. On or about April 10, 2020 Defendant informs Mr. Stalcup that it will need to test the HVAC units, get an electrician inspection, and talk to its vendors about the estimate. Defendant stated that they can get an electrician bid and that its HVAC vendor will reach out to schedule the inspection.

48. Mr. Stalcup followed up about the inspections on or about April 14, 2020.

49.     On or about April 21, 2020 a new tenant signed a lease with Plaintiffs on the unburdened portion of the premises.

50.     On or about May 12, 2020 Mr. Stalcup emails Defendant to ask for the HVAC and Genpac reports. Defendant forward the reports on May 17, 2020.

51.     On or about May 26, 2020, Mr. Stalcup completed an estimate which identified an RCV of $366,736.83 and an ACV of $340,857.26.  He submitted this estimate to Defendant on May 27, 2020.

52.     On or about June 11, 2020, June 18, 2020, and June 22, 2020, Mr. Stalcup emailed Defendant about the estimate he submitted.  He also left voicemails with the adjuster.

53.     On or about June 23, 2020 Defendant emailed Mr. Stalcup that it had revised its estimate but was waiting on a few more items.

54.     On or about June 26, 2020 Defendant completed an estimate which identified an RCV of $298,919.08 and an ACV of $285,134.26.  It sent the estimate to Mr. Stalcup on or about June 29, 2020.

55.     On or about August 6, 2020 Mr. Stalcup completed a supplemental estimate which identified an RCV of $384,117.80.

56.     On or about August 11, 2020, Mr. Stalcup sent his estimate, a signed proof of loss, and other supporting documentation which highlighted the discrepancies with Defendant's June 26, 2020 estimate.

57.     On or about September 17, 2020 Mr. Stalcup sent a follow up email as he had not received any response.

58.     After hearing nothing for over two months since Mr. Stalcup sent his revised estimate and email highlighting the discrepancies, Plaintiffs filed a complaint with the Department of Regulatory Agency (DORA) on or about October 6, 2020.

59.     On or about November 2, 2020, Defendant finally responds to Mr. Stalcup.

60.     On or about November 11, 2020, Defendant completed its final estimate which identified an RCV of $305,802.71 and an ACV of $300,535.51.  It submitted this estimate on or about November 20, 2020 and released the final remining limit of $23,333.94 as a result.

61.     Defendant continually undervalued the amount of Plaintiffs' claim and has forced them to hire additional individuals in order to receive all benefits owed.

62.     Defendant's actions have delayed communication by months at a time, resulting in Plaintiffs losing one tenant as a result, and delaying the overall completion of the Property being rebuilt.

63.     Defendant's actions have caused Plaintiffs damage.

## FIRST CAUSE OF ACTION
### (Bad Faith Breach of Insurance Contract)

64. Plaintiffs incorporate the other paragraphs of this Complaint as if fully set forth herein.

65. Defendant owed duties to Plaintiffs under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in exercise of fair dealing, deal with Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder or potentially injure Plaintiffs' rights to receive the Policy's benefits.

66. Defendant acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:

    a. Failing to properly investigate and evaluate Plaintiffs' claims for Policy benefits;
    b. Failing to communicate with Plaintiffs in a timely manner;
    c. Failing to pay amounts under the Policy in a timely manner;
    d. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;
    e. Delaying payment to Plaintiffs of amounts owed under the Policy without a reasonable basis;
    f. Failure to give equal consideration to Plaintiffs' rights and interests as it has given its own interests;
    g. Other conduct to be revealed through discovery.

67. As a result of this willful, wanton and reckless conduct, Plaintiffs have directly and proximately suffered damages as set forth more fully in her prayer for relief below.

## SECOND CAUSE OF ACTION
### (Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)

68. Plaintiffs incorporate the other paragraphs of this Complaint as if fully set forth herein.

69. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

70. Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

71. Defendant has improperly denied or delayed resolution of Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

72. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

73. Due to Defendant's actions and conduct as set forth herein in violation of C.R.S. §10-3-1115, Plaintiffs bring this claim to recover its reasonable attorneys' fees, court costs and, two times the covered benefit, as allowable under C.R.S. §10-3-1116.

WHEREFORE, Plaintiffs PDub Ents. LLC, Windsor One, LLC, and Big Prairie Ents, LLC, a Wyoming Limited Liability Company respectfully requests that judgment be entered in its favor and against Defendant Scottsdale Insurance Company as follows:

    a)     For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
    b)     For double damages pursuant to statute;
    c)     For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
    d)     For reasonable attorneys' fees and costs of suit herein; and
    e)     For such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated this April 28, 2021.

Respectfully Submitted,

ROTH MILNE

By:    */s/ David M. Roth*
       David M. Roth, #44800
       Jennifer A. Milne, #46286

ATTORNEYS FOR PLAINTIFFS PDUBS ENTS. LLC, WINDSOR ONE, LLC, AND BIG PRAIRIE ENTS, LLC, A WOYOMING LIMITED LIABILITY COMPANY

*In accordance with C.R.C.P. 121, §1-26(9), a printed copy of this document with original signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.*